# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 17, 2013

## JONATHAN PULLEY v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Wayne County**
**No. 15018      Stella Hargrove, Judge**

___

**No. M2012-01523-CCA-R3-CD - Filed May 31, 2013**

___

The petitioner, Jonathan Pulley, appeals the denial of his petition for post-conviction relief from his Wayne County Circuit Court convictions of aggravated sexual battery and assault, claiming that he was denied the effective assistance of counsel at trial.[1]  Discerning no error, we affirm the order of the Circuit Court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

A. Russell Larson, Jackson, Tennessee, for the appellant, Jonathan Pulley.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Mike Bottoms, District Attorney General; and Doug Dicus, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The petitioner, originally charged with two counts of rape of a child, entered pleas of nolo contendere to the lesser charges of aggravated sexual battery in exchange for a total effective sentence of eight years to be served at 100 percent by operation of law.  On the same day, the petitioner entered pleas of nolo contendere to unrelated charges of assault in exchange for a six-month sentence to be served concurrently to the eight-year aggravated sexual battery sentence.

___

[1]Because no judgments appear in the record, we glean the conviction offenses from the post-conviction court's order denying relief and the transcript of the plea hearing.

The petitioner filed a timely petition for post-conviction relief, alleging that he was denied the effective assistance of counsel, that his pleas were not knowingly and voluntarily entered, and that newly discovered evidence entitled him to relief.

At the April 26, 2012 evidentiary hearing, the 22-year-old petitioner testified that at the time he entered the pleas in this case, he was "19 or 20," that he had obtained a general education diploma some years before, and that he had served in the National Guard until being dishonorably discharged for using marijuana. The petitioner insisted that he was under the influence of Xanax when he entered the pleas, but he admitted that he told the trial court that he was not. He said that he ingested the drug in the courtroom and that, as a result, he "was almost unconscious" and "blacking out" while entering his plea. He acknowledged that his counsel did not know that he had taken the drug.

The petitioner said that he agreed to the plea offer and entered the nolo contendere pleas because his counsel recommended that he do so, saying, "It would be in my best interest to go ahead and take the plea, because I was facing a minimum of 15 years in prison." He testified that counsel told him, "[H]e was a major and I was the Private. It would be best if I listened to him." The petitioner said that this held great sway over him, explaining, "[A]t the time, I was prepared to go to war. Me and my unit were about to deploy, when I got sent back." He testified that his counsel compared his serving an eight-year prison sentence to "serving a hitch in the military" and told the petitioner that he "would come out clean." He insisted that his military training contributed to his decision to follow counsel's advice, but he also claimed that it was his ingestion of Xanax that prompted him to enter the pleas when he really wanted to go to trial. He maintained his innocence of the charges.

The petitioner acknowledged that he met with trial counsel several times prior to entering the pleas and admitted that counsel discussed discovery materials with him and provided the petitioner with a copy to "go through . . . at home." He testified that during those meetings, counsel assured him that he would be acquitted and that "all charges would be dropped." He claimed that when trial counsel presented the plea offer to him, he told the petitioner that the State's offer was "[e]ight years at 30 percent" and that he did not discover that his sentence required 100 percent service until after he had begun serving it. The petitioner said that he had no recollection of the trial judge's explaining the 100 percent service requirement during the plea hearing. The petitioner claimed that he tried to contact counsel after his discovery, but counsel did not respond.

The petitioner acknowledged that he told the trial court that he was satisfied with trial counsel's performance but insisted that he did so only because he "was just trying to get it over with" and that he "really wasn't happy" with counsel's services. Then, oddly,

he claimed that he had no memory of discussing counsel's performance with the court.

During cross-examination, the petitioner maintained that he had no memory of the plea submission hearing but insisted that his being "messed up" on Xanax caused him to enter the pleas. He also insisted that counsel's recommendation that he accept the plea offer weighed heavily in his decision to enter the pleas. The petitioner said that he did not recall that he actually accepted the plea agreement on the day originally set for trial and entered the pleas one week later. The petitioner acknowledged his signature on forms waiving a jury trial and entering pleas of nolo contendere, but he claimed that the signature was "a little tiny."

The petitioner acknowledged that counsel provided him with a copy of discovery materials and that he did not read the materials provided by counsel. He admitted that counsel specifically discussed with him the fact that his semen had been discovered on the victim's pajamas, corroborating her claim of abuse. Counsel also told him that he was facing a lengthy sentence if convicted and that his chances at trial were not good. The petitioner said that he understood that he had accepted a plea offer that provided him a significantly lower sentence than he faced if convicted after a trial.

Upon questioning by the court, the petitioner claimed that he had no recollection of characterizing counsel's representation as "awesome" when asked by the court during the plea submission hearing. He also claimed to have no recollection of questioning the trial court about the exact service percentage during the plea submission hearing.

The victim, 15-year-old C.W.,[2] testified that she did not have a sexual relationship with the petitioner and that she lied to Department of Children's Services ("DCS") workers because she "was mad" and "tired of him." She said that she "figured" that the "best way" to "get him away" was to lie to the DCS about their relationship. She testified that she and the petitioner never had a romantic relationship and said that the petitioner "was like a brother to" her and her "best friend." She said that despite their close relationship, she "added more on" to her story because she "knew he would get in trouble." She denied having any sexual contact with the petitioner.

C.W. claimed that she realized the magnitude of her lie after the petitioner went to jail. At that point, she said, she told her mother, her "Aunt Ruby," and her "Grandpa Johnny" what she had done. She testified that she "felt really bad about it" and "decided [she] was going to try to get him out." She acknowledged that she had signed a sworn

---

[2]As is the policy of this court we will refer to the minor victim by her initials.

affidavit recanting her earlier allegations.

During cross-examination, C.W. admitted that she told a DCS worker that the petitioner had raped her numerous times while she slept and that she "wanted him as far away from [her] as possible." She conceded that she told workers that, on one occasion, she awoke to find the petitioner cutting a hole in the crotch of her pajamas. She also conceded that she kept the pajamas and gave them to her mother after the incident. She claimed that she did not remember everything she had told the worker "because it wasn't true."

C.W. said that she and her mother still lived in a residence owned by her Aunt Ruby, who was also the petitioner's aunt, but testified that she did not know whether her Aunt Ruby had threatened to evict them if C.W. did not recant. She said that she first decided to recant "[a] couple of months" after the petitioner had gone to prison. C.W. testified that she had told only "a few people" because she did not "want everybody to know" and did not "want to get called a liar." She said that she could not recall where she went to provide the sworn affidavit or who had typed it, only that she had gone to the location with her mother and her Aunt Ruby. She acknowledged that some of the language in the sworn affidavit was not her own, explaining, "I don't think they wanted to go all through the details of what I said, but that pretty much sums it up." C.W. insisted that she wanted to help the petitioner get out of jail.

Trial counsel testified that he met with the petitioner 20 to 25 times during the time that the case was pending, sometimes meeting with the petitioner alone and sometimes with the petitioner and his father. During those meetings, he discussed with the petitioner the discovery materials, the potential sentence he faced if convicted, and the likelihood of conviction if the case went to trial. He said he specifically recalled the petitioner's father's asking how old the petitioner would be when he got out of prison if he refused the plea agreement and was convicted as charged. He also specifically recalled discussing with the petitioner the fact that his semen was discovered on the victim's pajamas. Counsel said that when negotiating the plea agreement in the petitioner's case, he utilized the forensic examiner's finding that the victim's hymen was intact to convince the State to permit the petitioner to plead to a lesser charge.

Counsel testified that the petitioner did not give any indication that he did not understand the charges, describing the petitioner as "a very intelligent young man" with "a high capacity for understanding." He said that he and the petitioner discussed serving in the National Guard, something they had in common, but he did not use that information to induce the petitioner to enter his pleas. He said that he "absolutely" did not get the impression that the petitioner regarded him as a superior officer whose orders must be followed, explaining, "I'm a J.A.G. Officer. . . . I've never commanded anybody in the

-4-

military." He said that he could not fathom that the petitioner would have honestly had such an impression because it was not his "practice to intertwine the two. . . . one has absolutely nothing to do with the other." He admitted, however, that he might have compared a prison sentence to "a hitch in the military" because he himself had returned from a tour of duty in Iraq shortly before undertaking representation of the petitioner. He recalled telling the petitioner that, like a tour of duty, a prison sentence was something that he could get through.

Counsel recalled that after he had agreed to accept the plea, the petitioner raised "an issue about needing to stay out and take care of some family business," so trial counsel got the State to agree to a delay. He said that he explained to the petitioner the entire process before they went to court for the plea submission hearing. He also recalled that he reviewed with the petitioner all the forms, including the waiver of rights form, that the petitioner signed prior to entering his pleas. Counsel said that the petitioner did not give any indication that he did not understand the information contained in the documents or the plea process.

Trial counsel testified that the petitioner did not appear to be under the influence of an intoxicant when he entered his pleas and emphasized that he would not have proceeded with the plea if he believed otherwise. He said, "I felt like he understood and was going forward voluntarily and knowingly with what we were doing." Counsel had no doubt that the petitioner understood the ramifications of the plea agreement.

Trial counsel testified that he interviewed C.W.'s mother but did not interview C.W. because of her age. With regard to the assault victim, A.R., trial counsel said that he did not interview her because of her youth. He could not recall whether he had interviewed any of A.R.'s family members. He said that he consulted with members of his family and a friend who were physicians to help him understand the medical evidence in the case. He said that he interviewed two of the DCS workers involved in the case.

Counsel could not recall whether he told the petitioner that they would be successful at trial but said, "That's not typically a statement I would make." He explained that he did not "like to build expectations."

Upon questioning by the court, trial counsel testified that the State had an open-file discovery policy.

Sabrina Wilson, C.W.'s mother, testified that C.W. initially told her that the petitioner "had done things to her while she was laying in the floor asleep." Upon hearing this, Ms. Wilson telephoned police and took C.W. to "a doctor to get her checked out." She said that C.W. never gave any indication that the allegations were false. At some point, C.W.

gave Ms. Wilson a pair of pajamas she had worn during one of the incidents with the defendant, and Ms. Wilson turned the pajamas over to DCS.

Ms. Wilson testified that "a while" after the petitioner went to jail, C.W. told her "that she didn't want him to be in jail and that it didn't really happen." She said that although she was convinced that C.W. was telling the truth when she made the allegations, she could not say for sure whether the recantation was truthful. Ms. Wilson said, however, that "if it did happen, [the petitioner] served two years already. That's what [the State] offered him to start with, and [she] was willing to accept that." She said that "[i]f it didn't happen, then it should be over with." She said that, in any event, she wanted the petitioner to be released from jail and that she had expressed that desire to C.W.

Ms. Wilson admitted that, before the petitioner entered his pleas, she told DCS workers and the prosecutor that she felt bad for the petitioner's family. She also admitted that she lived in a residence owned by Aunt Ruby and that she paid very little rent. She said that Aunt Ruby asked her to move out "at first" but then relented and permitted her to stay.

Upon questioning by the court, Ms. Wilson agreed that, "[w]ithout a doubt," she wanted the petitioner out of jail. She admitted that Aunt Ruby "took [her] to court, going on to ask [her] to leave the house."

DCS Team Leader Susan Franks testified that she interviewed C.W. just after C.W. made the allegations against the petitioner. She said that C.W. told her "that she had been molested by [the petitioner] on several occasions at her Aunt Ruby's home in Wayne County." C.W. "reported that . . . . she had awakened to him cutting her pajamas with a razor, and going up and down on her, and whispering to her." C.W. told Ms. Franks that the petitioner had penetrated her vagina with his penis and said that "'[i]t hurt and it was icky.'" Ms. Franks recalled that Ms. Wilson brought C.W.'s pajamas to the initial interview, and Ms. Franks turned them over to police, who sent them to the Tennessee Bureau of Investigation for testing. During subsequent interviews, C.W. related the same version of events.

Ms. Franks testified that, both before and after the petitioner entered his pleas, Ms. Wilson telephoned her and reported that "Aunt Ruby had threatened to have her move out of her house." Ms. Wilson told Ms. Franks that the threats were designed "[t]o get them to back up on the story about" the petitioner.

During cross-examination, Ms. Franks said that she had not interviewed C.W. since C.W. had decided to recant. She said that she interviewed the other victim, A.R., and that A.R. reported that the defendant had touched her breasts. Ms. Franks participated in an interview with a witness who saw the petitioner and A.R. "kissing and other things." She

also participated in an interview of the petitioner wherein the petitioner admitted that he touched A.R. "and was fixing to sign, when his daddy started banging on the window and told him not to sign anything."

At the conclusion of the hearing, the post-conviction court took the petition under advisement. In a written order, the court denied post-conviction relief, concluding that the petitioner was not deprived of the effective assistance of counsel and that his pleas were knowingly and voluntarily entered. Specifically, the court accredited trial counsel's testimony that he adequately investigated the case and prepared for trial, that he did not coerce the petitioner into entering the pleas, and that the petitioner was not under the influence of drugs when entering the pleas. The court found the petitioner completely lacking in credibility, noting that the transcript of the plea hearing belied the petitioner's claims that he was under the influence, that he did not understand the ramifications of the plea, and that he did not remember the proceeding. The court stated that it had "considerable difficulty with the credibility" of C.W. given that she admitted that her primary motive was to get the petitioner out of jail. As to Ms. Wilson, the court found "that she has little, if any, regard for the truth and for what really happened for her daughter." The court also found that "there was pressure by [p]etitioner's family, both prior to and after his plea, to get [C.W.] to change her story."

In this appeal, the petitioner contends that his pleas were not voluntarily, knowingly, and intelligently made because they were the product of the ineffective assistance of counsel. He claims that counsel performed deficiently by failing "to interview witnesses that have come forward and admitted the allegations made against the [p]etitioner were false" and that "[h]ad [t]rial [c]ounsel investigated the case then the fruits of such investigation would have produced the lack of veracity of the instant allegations." The petitioner also claims that counsel performed deficiently by failing to interview alibi witnesses. He claims that counsel's deficient performance resulted in his entering the nolo contendere pleas, saying, "Had the [p]etitioner known that the witnesses were going to admit that the allegations were false he would not have accepted the plea."

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the post-conviction court's findings of fact are conclusive unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn.1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of

correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn.1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App.1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Apart from whether a guilty plea is the product of ineffective assistance of counsel, it is invalid if otherwise made unknowingly or involuntarily. "Whether a plea was knowing and voluntary is an issue of constitutional dimension because 'the due process provision of the federal constitution requires that pleas of guilty be knowing and voluntary.'" *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2000) (quoting *Johnson v. State*, 834 S.W.2d 922, 923 (Tenn. 1992)). A plea "may not be the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats.'" *Wilson*, 31 S.W.3d at 195 (quoting *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969)); *see also State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003) (citing *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993)).

Both claims of ineffective assistance of counsel and involuntary guilty plea are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn.2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19

S.W.3d 762, 766 (Tenn. 2000).

We may easily dispense with the petitioner's claim that trial counsel performed deficiently by failing to ascertain that C.W. had fabricated the allegations. First, to charge counsel with the duty of knowing that C.W. would later recant allegations that she had repeated multiple times with complete consistency and which were fully supported by the physical evidence, most notably C.W.'s razor-cut, semen-stained pajamas, would be to attribute to counsel powers of divination. C.W. admitted during the evidentiary hearing that she did not tell anyone that she had fabricated the allegations until several months after the petitioner had gone to prison and that her primary object in creating her affidavit and testifying at the hearing was to get the petitioner out of prison. To say that counsel performed deficiently by failing to know the future is ludicrous. Second, the post-conviction court found both C.W. and her mother to be completely devoid of credibility, going so far as to say of C.W., "With the exception of stating her name, age and grade level, the [c]ourt does not believe one word spoken by [C.W.] at the hearing. The [c]ourt finds that her statement of July 5, 2011, is not true." Ms. Wilson, the post-conviction court said, evinced "little, if any, regard for the truth."

Although the petitioner contends that the post-conviction court's credibility determinations reflect "the obvious bias of the [court] against" C.W. and that the post-conviction court's tough questioning during the hearing "clearly showed a predisposition to deny the [p]etitioner and to side wholly with the State," no proof to support the petitioner's claims exists in the record. Moreover, this court must defer to the post-conviction court's resolution of credibility issues. *See Massey v. State*, 929 S.W.2d 399, 403 (Tenn. Crim. App. 1996); *Taylor v. State*, 875 S.W.2d 684, 686 (Tenn. Crim. App. 1993). The post-conviction court, who saw and heard the witnesses first hand, is the best judge of witness credibility.

As to the petitioner's claim that his pleas were not voluntarily or knowingly entered, the record establishes that the petitioner entered his pleas based upon the advice of counsel given after a thorough investigation of the case. Counsel's performance in securing such a beneficial plea offer in the face of overwhelming evidence that the petitioner was guilty of raping 11-year-old C.W. was nothing short of outstanding. The petitioner received a total sentence of eight years when, had he been convicted as charged at trial, he faced as much as 50 years in prison. *See* T.C.A. § 40-35-112(a)(1). Under these circumstances, counsel's advice that the petitioner accept the offer was sound. The transcript of the petitioner's plea submission hearing belies the petitioner's claims that he was under the influence of drugs, unable to communicate with the court, or an unwilling participant in a charade. Instead, the transcript reflects that the petitioner fully understood the gravamen of the charges against him, the benefit of pleading nolo contendere to greatly reduced charges in exchange for a much lighter sentence, and the ramifications of entering the pleas.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE